IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| ANTHONY DYE, | ) | Civil Action No. 3:07-0662-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI").

**ADMINISTRATIVE PROCEEDINGS**

In December 2003, Plaintiff applied for SSI. Plaintiff's application was denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held April 20, 2006, at which Plaintiff appeared and testified, the ALJ issued a decision dated July 19, 2006, denying benefits. The ALJ found that Plaintiff was not disabled because, under the vocational guidelines promulgated by the Commissioner, Plaintiff remains able to perform work found in the national economy. See generally 20 C.F.R., Part 404, Subpart P, Appendix 2.

Plaintiff was thirty-nine years old at the time he alleges he became disabled and forty-one years old at the time of the ALJ's decision. He has a tenth grade education and past relevant work as a brick mason and as a doffer. Plaintiff alleges disability since November 1, 2003, due to heart attacks, high blood pressure, diabetes, and blindness of his right eye.

The ALJ found (Tr. 15-20):

1.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 419.920(b) and 416.971 *et seq.*).

2.    The claimant has the following severe impairments: coronary heart disease (status-post 2 heart attacks) with shortness of breath (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work activity.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on August 2, 1964 and was 39 years old on the alleged disability onset date, which is defined as a younger individual 18-44 (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    The claimant does not have transferable skills from past relevant work.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.    The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(g)).

On January 12, 2007, the Appeals Council denied Plaintiff's request for review, making the

decision of the ALJ the final action of the Commissioner.  Plaintiff filed this action on March 7,

2007.  The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972).  Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...."  See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## DISCUSSION

On November 3, 2003, Plaintiff was admitted to Self Regional Healthcare in Greenwood, South Carolina for complaints of chest pain.  A chest x-ray revealed the presence of an inferior posterior myocardial infarction. Plaintiff underwent a cardiac catheterization which revealed severe coronary artery disease including that the circumflex was totally occluded at the first obtuse marginal and that the right coronary artery was totally occluded proximally.  Dr. Paul Kim, a cardiologist, placed a stent in Plaintiff's proximal circumflex artery.  Plaintiff was discharged from the hospital on November 4, 2003.  Tr. 181-206.

On November 11, 2003, Plaintiff was treated on two occasions in the emergency room.  Tr. 207-235.  In the morning, he was treated for a dislocated right shoulder.  Tr. 223-225.  That evening, he complained of pain in his right groin area (area where catheterization incision was made). Tr. 209-213. On November 13, 2003, Plaintiff was diagnosed with groin pain; chronic back, leg, and gluteal musculoskeletal pain; coronary artery disease; diabetes; and hypertension.  Lortab

and Ultram were prescribed for pain.  Tr. 379.  On December 10, 2003, Plaintiff complained to Dr. Kim of daily aching chest pain regardless of activity.  He was found to be somewhat hypertensive. Tr. 378.

In January 2004, Plaintiff underwent Cardiolite stress testing.  Abnormal stress and rest images were reported with a dilated left ventricle.  There was a severe fixed inferior basilar defect and a moderate fixed inferior and inter-apical defect.  Exercise stress testing revealed that Plaintiff had an ejection fraction[1] of 34% and he was able to achieve an aerobic capacity of 6.5 METS.  The results were found to be compatible with ischemic cardiomyopathy.  Tr. 400-403.

On February 13, 2004, Plaintiff was examined by Dr. Thomas Pritchard of Self Regional Healthcare, who diagnosed Plaintiff with chest pain atypical for angina, hypertension, and diabetes mellitus.  Dr. Pritchard restarted Plaintiff on aspirin and continued his medicines for hypertension and diabetes.  Tr. 397-398, 513-514.

On March 18, 2004, Plaintiff reported to Dr. Kim that he had exertional chest discomfort and was taking nitroglycerine.  He complained that his functional status had declined since November 2003, and he was unable to perform past activities.  Dr. Kim was concerned about Plaintiff's medication compliance and changed Plaintiff's blood pressure prescription in an attempt to alleviate ankle swelling.  Tr. 376.

---

[1]Ejection fraction is:

the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; it is the stroke volume divided by the end-diastolic volume, often expressed as a percentage.  It is normally 65 [plus or minus] 8 percent; lower values indicate ventricular dysfunction.

Dorland's Illustrated Medical Dictionary 734 (30th ed. 2003).

4

On March 24, 2004, an echocardiogram was performed which revealed moderate to severe left ventricular function, left ventricle ejection fraction of 25-30%, impaired relaxation left ventricle diastolic inflow, dilated left ventricle, and some left ventricular hypertrophy.  Tr. 395-396.

On March 29, 2004, Dr. Charles B. Bobo, an ophthalmologist, completed a form for the South Carolina Department of Public Safety.  He noted that Plaintiff's vision was 20/100 on the right, 20/20 on the left, and 20/20 with both eyes.  He diagnosed Plaintiff with an eye injury of the right eye-conversion hysteria.   Tr. 250.

On April 18, 2004, Plaintiff was examined in the Self Regional Healthcare emergency room for complaints of swelling in his right ankle and pain in his right leg.  Plaintiff was diagnosed with probable diabetic neuropathy.  Tr. 255, 260-261.

On April 20, 2004, Dr. Kim noted that Plaintiff's ejection fraction worsened in March to about 25-30%.  Plaintiff had significant dyspnea on exertion and got short of breath after walking a short distance.  Dr. Kim doubted that Plaintiff would be able to return to past-type work, noted that Plaintiff's prognosis was poor, and noted that Plaintiff had co-morbid conditions including hypertension and type II diabetes mellitus.  Additionally, Dr. Kim opined that Plaintiff's ischemic cardiomyopathy was severe enough, along with his New York Heart Association ("NYHA")[2] class II-III symptoms, to limit his ability to work as a manual laborer.  Dr. Kim requested that Plaintiff be considered for disability benefits.  Tr. 375.

---

[2]NYHA Functional Class II is applied to "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain." Class III is applied to "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain." See www.americanheart.org; Sellers v. Heckler, 590 F.Supp. 1141, 1143 n. 1 (D.C.N.Y. 1984).

On May 13, 2004, Dr. Seham El-Ibiary, a State agency physician, reviewed Plaintiff's medical record and opined that Plaintiff could perform sedentary work.  Tr. 357-364.

On May 25, 2004, Plaintiff complained to Dr. Kim of chest pain with or without exertion, shortness of breath with exertion, numbness in his legs, and poorly controlled blood sugar.  Dr. Kim noted that Plaintiff had been prescribed Neurontin for neuropathy.  Plaintiff had mild ankle edema and uncontrolled diabetes associated with peripheral neuropathy.  Dr. Kim wrote that Plaintiff's chest pain was atypical and might be radicular pain due to diabetic neuropathy.  He started Plaintiff on Amitriptyline and increased the dosage of Glyburide (for diabetes).  Tr.  374.

On July 2, 2004, Dr. Kim performed a cardiac catheterization for Plaintiff's complaints of increasing chest pain.   Dr. Kim found that Plaintiff had an ejection fraction of 35%.  Plaintiff's cardiac catheterization report indicated ischemic cardiomyopathy with patent native vessels, and moderately depressed left ventricular systolic function.  Dr. Kim noted that Plaintiff's liver transaminase levels were elevated and he ordered a hepatic panel for possible viral hepatitis.  Tr. 306-310.  Plaintiff's hepatitis panel came back reactive for hepatitis C.  Tr. 312.

On July 11, 2004, Plaintiff was treated at the Self Regional Healthcare emergency room for complaints of right groin pain and pressure at the catheterization site.  He was diagnosed with right anginal adenopathy.  Tr. 329.  Ultrasound the next day revealed no evidence of pseudoaneurysm. Tr. 373.

Dr. Scarlet Taylor, a family physician, began treating Plaintiff in August 2004 for various ailments, including hypertension, diabetes mellitus, coronary atherosclerosis, neuropathy-peripheral, hepatitis C, hyperlipidemia, dysuria, and abdominal pain.  Tr. 406-479, 537-591, 636-655.  On

August 12, 2004, it was noted that Plaintiff's blood sugar levels were high at 300-400.  His triglyceride level was high at 622.  Tr. 467-470.

On August 23, 2004, Dr. William O. Crosby, a State agency physician, reviewed Plaintiff's medical record and opined that Plaintiff could perform sedentary work despite having coronary artery disease and diabetes with peripheral neuropathy.  Tr. 345-354.

On August 23, 2004, Plaintiff reported to Dr. Kim that he was still taking nitroglycerin for occasional chest pain.  Dr. Kim noted that Plaintiff had severe ischemic cardiomyopathy with hypertension, could not afford treatment for his hepatitis C, and was trying to obtain disability.  Tr. 372. On August 24, 2004, Dr. Taylor wrote that Plaintiff's blood sugar readings ranged from 200 to 300 after the increase of Glyburide.  She added Metformin to better control Plaintiff's diabetes. Tr. 459-460.

On August 29, 2004, Plaintiff was treated at a hospital emergency room for abdominal and flank pain.  He was diagnosed with a urinary tract infection, hepatitis C acute, diabetes mellitus type II uncontrolled, hypertension, and coronary disease.  Tr. 487-492.  On September 4, 2004, Plaintiff was treated for pyelonephritis (kidney infection) and pneumonia.  Tr. 494-497.

Dr. Taylor assessed Plaintiff with abdominal pain on September 7, 2004, and recommended an EGD and colonoscopy.  Tr. 441-442.  Plaintiff returned on September 20, 2004, with complaints of abdominal pain, dysuria, and fever.  His blood sugars were running 180-240.  Plaintiff's dosage of Metformin was increased. Tr. 431-435.

On November 9, 2004, Plaintiff was treated in the emergency room for a headache and two days of chest palpitations.  Tr. 498-500.  The next day, Plaintiff reported to Dr. Kim that he was having skipping sensations in his left pericardium that lasted a couple of seconds at 5-20 second

intervals.  Plaintiff had exertional chest pain lasting 20-30 minutes and he was taking nitroglycerin twice a day for chest pain.  Dr. Kim ordered a Holter monitor to evaluate the palpitations and a stress test to assess chest pain and dyspnea on exertion.  Tr. 370-371.

On November 16, 2004, Plaintiff underwent a pharmacologic stress test, which revealed ischemia and an ejection fraction of 31%.  Tr. 388.  The Holter monitor was mostly normal, but revealed rare premature ventricular complexes, rare ventricular couplets, and rare ventricular triplets. Tr. 383.  On November 19, 2004, Plaintiff was treated in a hospital emergency room for complaints of a headache after receiving a small jolt from a stun gun.  Tr. 498-500.

In a letter dated December 2, 2004, Dr. Kim stated that "40-50% of [Plaintiff's] heart muscle [had] been replaced by scar tissue" and that his ejection function had dropped to 31%.  Dr. Kim noted that this was well documented by a chemical stress test which was used after Plaintiff was unable to complete a treadmill stress test.   He also wrote that Plaintiff's functional impairment under the NYHA guidelines would be between classes II and III.  Tr. 369.

On December 22, 2004, Plaintiff complained of anxiety and depression and requested a referral to a psychiatrist.  Dr. Taylor prescribed Zoloft and referred Plaintiff to a mental health center.  Tr. 573.  On December 23, 2004, Plaintiff reported to Dr. Kim that he had depression due to court proceedings, having no income, not working, and not being able to get treated.  Plaintiff revealed that he had been arrested nine times for domestic violence and reported that he felt very angry and might react.  Dr. Kim increased Plaintiff's dosage of Atenolol and recommended a referral to a mental health facility, noting concern over Plaintiff's history of violence.  Tr. 367-368.

On February 8, 2005, Plaintiff reported to Dr. Taylor that his mood was much improved since starting medication and seeing a counselor.  He also complained of continued pain in his right

upper quadrant.  Tr. 568.  Plaintiff again told Dr. Taylor that his depression had improved on

February 22, 2005.  Tr. 563.

On March 7, 2005, Plaintiff told Dr. Taylor that his depression was improved with

medication, counseling, and going to church.  Dr. Taylor answered a questionnaire regarding

Plaintiff's work limitations.  As to whether Plaintiff could engage in sedentary work if he worked

a forty-hour work week, Dr. Taylor responded "Yes, if [he] has to walk only short distances."  In

response to a question that asked whether Plaintiff would "most probably" have to rest away from

his work station for more than an hour a day if he worked a forty-hour work week, Dr. Taylor

answered "yes."  In response to a question that asked whether it was "most probable" that Plaintiff

would have to miss more than three days of work per month if he worked a forty-hour work week,

Dr. Taylor answered "yes."  As to whether it was "most probable" that Plaintiff would have

problems with attention and concentration sufficient to interrupt tasks during the work day, Dr.

Taylor answered "yes."  She stated that her opinions were based on Plaintiff's diagnoses of

hypertension, diabetes, coronary atherosclerosis, peripheral neuropathy, hepatitis C, hyperlipidemia,

and depression.  Tr. 410  Dr. Taylor also wrote that Plaintiff's functional impairment under the

NYHA functional classification system was between classes II and III.  She opined:

> [Plaintiff] would not be able to perform a job that involved physical labor or one that
> even involved walking long distances.  He could perhaps engage in sedentary work
> if he were able to sit most of the time and only walk short distances. [Plaintiff] would
> most likely have to rest away from the work station for more than an hour during the
> working portion of the work day.  He would also probably have to miss more than
> 3 days of work per month in order to keep follow-up appointments for his multiple
> medical problems alone. [He] would likely have problems with attention and
> concentration while at work secondary to depression.

Tr. 408-409.

9

On April 21, 2005, Plaintiff underwent a UGI series which revealed a sliding hiatal hernia with reflux. Tr. 501. On April 6, 2005, Plaintiff complained of anxiety and depression and requested Valium. Dr. Taylor refused Plaintiff's request for Valium, but increased his dosage of Wellbutrin. Tr. 551-554. On May 12, 2005, Plaintiff denied any symptoms of anxiety and depression. Tr. 547.

On June 2, 2005, Dr. Taylor wrote a letter to Plaintiff's attorney in which it was noted that Plaintiff had hypertension, diabetes mellitus, coronary atherosclerosis, neuropathy-peripheral, hepatitis C, abdominal pain, and depression/anxiety. Twelve medications were prescribed for Plaintiff's medical problems. She wrote:

> Without ongoing medical care and these medications, [Plaintiff's] medical condition will drastically decline. [Plaintiff] needs financial assistance in order to continue his medical care and receive his medications. [Plaintiff] also has Hepatitis C that has not been treated aggressively secondary to patient not having financial means to pay for the treatment.

Tr. 406-407.

On July 13 and 21, 2005, Plaintiff underwent Cardiolite imaging studies. The studies revealed transmural scar in the inferior segment, abnormal wall motion with global hypokinesis and akinesis in the inferior segment, and severely reduced ejection fraction of 25% that was deteriorated since a previous study done on November 2002. Tr. 583-584, 607.

On September 19, 2005, Plaintiff complained of chest pain while incarcerated at the Greenwood Detention Center and was taken for treatment to Self Regional Healthcare. A catheterization with selective angiography and left ventriculogram revealed an ejection fraction of 35% and a new 40% stenosis in the mid portion of Plaintiff's circumflex artery. Tr. 601-602.

On November 1, 2005, Plaintiff reported to Dr. Taylor that his blood sugars had been in the

200s recently, but were well controlled while he was at the detention center.  Taylor noted no

evidence of anxiety, depression, or agitation.   She recommended medication for Plaintiff's

complaints of difficulty with swallowing.  Tr. 537-540.  On November 30, 2005, Dr. Taylor

followed up on Plaintiff's uncontrolled diabetes.  Plaintiff's blood sugars were running 200-300 and

it was noted that he was not taking his other medications as prescribed.   An additional medication

was added to help control Plaintiff's diabetes and weight loss and exercise were recommended.  Dr.

Taylor noted no evidence of Plaintiff having anxiety, depression, or agitation.  Tr. 649-653.  On

January 9, 2006, Plaintiff complained of right flank pain.  Tr. 646-668.  On January 24, 2006, Dr.

Taylor noted that Plaintiff was slightly anxious.  Tr. 642. A February 21, 2006 ultrasound revealed

two hyperechoic liver lesions which were most compatible with benign hemangiomas.  Tr. 636.

Plaintiff alleges that the ALJ: (1) erred by failing to properly evaluate whether Plaintiff's

ischemic heart disease and coronary artery disease met or equaled one of the listings of impairments

("Listings"), 20 C.F.R. Pt. 404, Subpt. P, App. 1; (2) failed to consider all of Plaintiff's impairments;

and (3) failed to properly assess his treating and evaluating physician's opinions.  The Commissioner

contends that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence[3]

and free of legal error.

---

[3]Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion.  It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance.  If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th
Cir. 1966).  It must do more, however, than merely create a suspicion that the fact to be established
exists.  Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

A.    <u>Substantial Evidence/Severe Impairments</u>

Plaintiff appears to allege that the Commissioner's decision is not supported by substantial evidence.  In particular, he claims that the ALJ erred in not finding that his diabetes and depression were "severe" impairments and in failing to consider all of his impairments.  The Commissioner contends that the ALJ properly found that Plaintiff's heart impairment was his only severe impairment.

It is the claimant's burden to show that he had a severe impairment.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 145 n. 5 (1987).  A non-severe impairment is defined as one that does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).    "Basic work activities" means:

The abilities and aptitudes necessary to do most jobs.  Examples of these include --

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).  An impairment is "not severe" or insignificant only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984).

The ALJ erred in not considering all of Plaintiff's impairments. In particular, it appears the ALJ did not consider Plaintiff's impairments of diabetes and diabetic neuropathy. Plaintiff has presented evidence that these impairments are significant. He was treated with numerous medications, which required numerous changes in medications and dosages, for his diabetes. There is evidence that Plaintiff's blood sugar levels were not always controlled. Diabetic neuropathy was diagnosed by Dr. Taylor, probable diabetic neuropathy was diagnosed by an emergency room physician (Tr. 255, 260-261), and Dr. Kim suspected diabetic neuropathy. Dr. Taylor and Dr. Kim prescribed medications for diabetic neuropathy. Dr. Crosby, a State agency physician, also opined that Plaintiff had the severe impairment of diabetic neuropathy. Tr. 345.

The ALJ also does not appear to have fully considered whether Plaintiff had a severe mental impairment. There are numerous notations in the medical record of Plaintiff being depressed and anxious. He was prescribed medications for depression and anxiety. Plaintiff also sought counseling for his mental impairments. As discussed further below, the ALJ appears to have ignored Dr. Taylor's opinion that Plaintiff's attention and concentration were affected by his depression.

B.    Treating Physician

Plaintiff alleges that the ALJ erred in failing to properly consider the opinion of his treating physician, Dr. Taylor (Tr. 408-410). The Commissioner contends that the ALJ properly considered Dr. Taylor's opinion and discounted portions of it because her opinion was not substantiated by the record.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

13

1988), and <u>Foster v. Heckler</u>, 780 F.2d 1125, 1130 (4th Cir. 1986). In those cases, the court emphasized the importance of giving great weight to the findings of the plaintiff's treating physician. <u>See</u> <u>also</u> <u>Mitchell v. Schweiker</u>, 699 F.2d 185 (4th Cir. 1983). The court in <u>Mitchell</u> also explained that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled. <u>DeLoatche v. Heckler</u>, 715 F.2d 148 (4th Cir. 1983).

The Commissioner is authorized to give controlling weight to the treating source's opinion if it is not inconsistent with substantial evidence in the case record and it is well supported by clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2). The Court in <u>Craig</u> found by negative implication that if the physician's opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig</u>, 76 F.3d at 589.

The ALJ gave great weight to Dr. Taylor's opinion that Plaintiff was limited to sedentary work involving no walking of long distances. He, however, discounted Dr. Taylor's opinion that Plaintiff "might" need more than an hour away from his work station to rest and would miss 3 days per month due to follow-up appointments because the treatment notes did not substantiate such frequency of medical care and because Plaintiff testified that he would need to rest every hour due to back pain (which the ALJ found was not a severe impairment). This mischaracterizes Dr. Taylor's opinion. Dr. Taylor stated that Plaintiff "most likely" (rather than "might") need to rest away from the work station for "more than an hour during the working portion of the work day." The impairments listed by Dr. Taylor as contributing to this do not include a back impairment.

14

Plaintiff's medical record contains evidence of numerous medical appointments.  Further, the ALJ

did not address Dr. Taylor's restriction that Plaintiff would "likely have problems with attention and

concentration while at work secondary to depression" and that this would be sufficient to interrupt

tasks during the work day.  Tr. 408, 410.

        C.      <u>Listings</u>

        Plaintiff alleges that the ALJ erred in not finding that his ischemic heart disease and

coronary artery disease met and/or equaled the Listings at § 4.02 (chronic heart failure)  and/or

§ 4.04 (ischemic heart disease).  The Commissioner contends that the ALJ's failure to discuss these

Listings in finding that Plaintiff did not meet or equal the Listings is harmless because Plaintiff did

not meet or equal one of these listings.[4]

        Here, it is impossible to determine if the ALJ properly evaluated whether Plaintiff's

impairments met or equaled one of the Listings.  The ALJ merely stated that Plaintiff did not have

an impairment or combination of impairments that met or medically equaled one of the listed

impairments.  It is unclear from the ALJ's opinion which of the Listings were considered, as the ALJ

---

[4]"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).  It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment.  20 C.F.R. § 404.1525(d); <u>see</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition).  The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment.  20 C.F.R. § 404.1526(a). A claimant has to establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met."  <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

did not discuss any of the Listings, did not explain how he came to this conclusion, and did not compare Plaintiff's impairments to the criteria of the Listings.  It is only when the record reflects a comparison of the individual's impairment-related symptoms, signs, and laboratory findings with the corresponding listing criteria that such a determination can be made. See 20 C.F.R. §§ 416.925 and 416.926(a); Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).

CONCLUSION

The Commissioner's decision is not supported by substantial evidence.  This action should be remanded to the Commissioner to consider all of Plaintiff's impairments, determine whether Plaintiff's impairments met or equal one of the Listings, and to properly consider the opinion of Plaintiff's treating physician (Dr. Taylor).

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and 1383(c)(3) and that the case be remanded to the Commissioner for further administrative action as set out above.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

August 25, 2008
Columbia, South Carolina